UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

*JAN 7 2015*

*JUDGE HARRY D. LEINENWEBER*
*U.S. DISTRICT COURT JUDGE*

UNITED STATES OF AMERICA

v.

MARK ANSTETT

No. 14 CR 102-1

Judge Harry D. Leinenweber

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant MARK ANSTETT, and his attorney, THOMAS MCQUEEN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with mail fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1341 (Count One); wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343 (Counts Two through Six); and bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts Six through Ten).

3.     Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count Five, which charges defendant with wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count Five of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than 2007, and continuing until in or about October 2009, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant Mark Anstett, along with Sheldon Player and George Ferguson, participated in a scheme to defraud financial institutions and finance companies, and to obtain money and property from financial institutions and finance companies by means of materially false and fraudulent pretenses, representations, and promises, which scheme affected financial institutions. Defendant executed the scheme by knowingly causing to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer processed through the Federal Reserve System

2

in the amount of approximately $1,363,780 from First National Bank of McHenry to a Machine Tools Direct account at Orrstown Bank, which funds represented financing from First National Bank of McHenry to Equipment Acquisition Resources for the purchase of equipment from Machine Tools Direct.

During the scheme, and at the direction of Sheldon Player, in or about 2007, defendant was named President and became a co-owner of Equipment Acquisition Resources, a company based in Palatine, Illinois that purported to make semiconductor wafers and refurbish machinery used to make semiconductor wafers. Defendant owned a share of EAR along with Sheldon Player's wife. Sheldon Player controlled the finances of EAR. EAR purported to purchase equipment from Machine Tools Direct, a company based in Carlisle, Pennsylvania that purchased and sold machine tools. Co-defendant George Ferguson was MTD's owner and President.

As part of the scheme, defendant knew that EAR obtained financing from financial institutions and finance companies through fraudulent means. For example, defendant participated in obtaining financing for EAR by causing false and fraudulent invoices to be submitted to financial institutions and finance companies. The invoices reflected that EAR was purchasing equipment from MTD. The invoices identified the equipment that was purportedly the subject of the invoice, and listed a price at which EAR was purchasing the equipment from MTD. The invoices were submitted to financial institutions and finance companies in support of financing requests from EAR. Specifically, EAR submitted the invoices along with others documents to financial

3

institutions and finance companies in order to obtain financing to purportedly purchase from MTD the equipment listed in the invoices. The information in the invoices was material to financial institutions and finance companies in providing loans because the invoices reflected what purported to be an arms-length transaction between MTD and EAR, at a fair and negotiated purchase price for the equipment described in the invoice.

Defendant knew that these invoices EAR submitted to financial institutions and finance companies to obtain financing were fraudulent. In particular, defendant knew that the invoices did not reflect real transactions between EAR and MTD because EAR was not seeking to purchase the items listed in the invoices from MTD. Moreover, defendant knew the purchase prices of the equipment listed in the invoices were inflated and not determined through any arms-length negotiations between EAR and MTD. Instead, Player and Ferguson had been working together to make it appear to financial institutions and finance companies that EAR and MTD were separate companies and that EAR needed financing to purchase equipment from MTD. Defendant joined that scheme.

When financial institutions and finance companies funded loans to EAR based in part on the false and fraudulent invoices that were submitted, the financial institutions and finance companies often provided the funds directly to MTD. After financial institutions and finance companies provided money to MTD, MTD sent all but 2% of the loan proceeds to EAR accounts that Player controlled. While defendant did not know of the 2% agreement between Player and MTD, he knew that Player used the funds that MTD provided to pay back other loans that EAR fraudulently obtained. Defendant knew

4

that these funds sent from MTD to EAR accounted for most of the money that EAR received into its bank accounts.

Also as part of the scheme, defendant met with representatives from financial institutions and finance companies doing due diligence regarding potential loans to EAR. During these meetings, defendant made false representations about EAR needing to purchase equipment because of contracts with or work to be performed for other semiconductor and technology companies. Defendant knew that EAR had no such contracts or relationships with these companies, and was not in fact seeking financing to purchase equipment for this purpose. Instead, defendant knew that EAR was seeking financing in order to have money for cash flow and to use to pay back other loans.

For example, in August 2009, First National Bank of McHenry, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, loaned approximately $1.3 million to EAR purportedly for EAR to purchase two pieces of new equipment from MTD. Prior to the funding of the loan, defendant met with a representative from First National Bank of McHenry at EAR's warehouse in Palatine, Illinois. At that time, defendant informed the bank representative that EAR needed financing for work it was performing for a company. Defendant knew that statement was false. As defendant knew, EAR was seeking financing from First National Bank of McHenry in order to pay back other loans that EAR obtained.

After the meeting, defendant also falsely told the First National Bank of McHenry representative that EAR had received the equipment from MTD that was the subject of

5

the financing. In fact, defendant knew that EAR was not purchasing a piece of equipment from MTD, and that no such equipment had been delivered to EAR from MTD.

Also during the scheme, defendant knew that Player had a criminal conviction for fraudulently obtaining financing from financial institutions and finance companies. As a result, defendant and Player took steps to hide Player's involvement in EAR from financial institutions and finance companies. Defendant and Player did this because they knew that some financial institutions and finance companies would not lend money to EAR if they knew about Player's criminal background. The steps that defendant and Player took to hide Player's involvement included making it appear that defendant was in charge of EAR's day-to-day business operations so that Player's involvement in EAR would be concealed.

In 2009, after EAR failed to make payments on loans it fraudulently obtained from financial institutions and finance companies, defendant often lulled representatives from the financial institutions and finance companies by falsely telling them that EAR missed payments because of problems obtaining accounts receivables from companies for which EAR performed work. In fact, defendant knew that EAR could not make its loan payments because it could not obtain new financing from lenders.

As a result of the fraudulent scheme, at least approximately 42 financial institutions or finance companies provided approximately $196 million in financing to

6

EAR, and sustained losses of approximately $112,772,779 because EAR did not pay those loans back.

On or about September 23, 2009, at Palatine, in the Northern District of Illinois, Eastern Division, and elsewhere, as part of and to advance the scheme, defendant knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer processed through the Federal Reserve System in the amount of approximately $1,363,780 from First National Bank of McHenry to an MTD account at Orrstown Bank, which funds represented financing from First National Bank of McHenry to EAR for the purchase of equipment from MTD.

### Maximum Statutory Penalties

7.      Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of 30 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $1,000,000, or twice the gross gain or gross loss resulting from the offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than five years.

b.      Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

7

c.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

8.      Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9.      For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2014 Guidelines Manual.

b.      **Offense Level Calculations**.

i.      The base offense level is 7, pursuant to Guideline § 2B1.1.

ii.      Pursuant to Guideline § 2B1.1(b)(1)(N), defendant's offense level is increased by 26 levels because the loss amount is approximately $112,772,779, which exceeds $100,000,000 but is less than $200,000,000.

iii.      Pursuant to Guideline § 2B1.1(b)(2)(A)(i), defendant's offense level is increased by 2 levels because the offense involved ten or more victims.

8

iv.     Pursuant to Guideline § 2B1.1(b)(10)(C), defendant's offense level is increased by 2 levels because the offense involved sophisticated means.

v.     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vi.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

9

d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 34, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 151 to 188 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

10.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the

10

guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

11.     Each party is free to recommend whatever sentence it deems appropriate.

12.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.     Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution to victims in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing.

14.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

17.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

### Forfeiture

18.     The indictment charges that defendant is liable to the United States for approximately $196,000,000, which funds are subject to forfeiture because those funds constitute proceeds of or were involved in the violations alleged in Count Five.  By entry of a guilty plea to Count Five of the indictment, defendant acknowledges that the property identified above is subject to forfeiture.

19.     Defendant agrees to the entry of a forfeiture judgment in the amount of $196,000,000, in that these funds are subject to forfeiture.  Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds so that these funds may be disposed of according to law. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution,

cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

20.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 102.

21.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

**Waiver of Rights**

22.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree

14

unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii.     With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine

whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

        b.    **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

        23.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

        24.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

        25.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office

regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

26.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

27.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States

17

Attorney's Office. Defendant understands that pursuant to Title 12, United States Code, Sections 1785(d) and 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the National Credit Union Share Insurance Fund or the Federal Deposit Insurance Corporation, except with the prior written consent of the National Credit Union Administration Board or the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he knowingly violates this prohibition, he may be punished by imprisonment for up to five years, and a fine of up to $1,000,000 for each day the prohibition is violated.

28.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

29.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

30.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence

18

defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

31.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

32.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

33.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____1 / 7 /14_____

_Zachary T. Fardon by JBP_
ZACHARY T. FARDON
United States Attorney

_Jason A. Yonan_
JASON A. YONAN
Assistant U.S. Attorney

_Mark Anstett_
MARK ANSTETT
Defendant

_Thomas McQueen_
THOMAS MCQUEEN
Attorney for Defendant

20